**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE BANK OF NEW YORK MELLON, | : | |
| solely as Trustee for GE-WMC Mortgage | : | |
| Securities Trust 2006-1, | : | |
| | : | CIVIL ACTION NO. 12-CV-07096 (DLC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WMC MORTGAGE, LLC and GE | : | |
| MORTGAGE HOLDING, L.L.C., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO WMC MORTGAGE, LLC'S MOTION TO LIMIT**
**THE EXPERT TESTIMONY OF IRA H. HOLT**

BOIES, SCHILLER & FLEXNER LLP

333 Main Street
Armonk, NY 10504
P:  914-749-8200
F:  914-749-8300

*Counsel for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.    HOLT'S REUNDERWRITING PROCESS ...................................................... 3

      A.    The Analytic Focus Reunderwriting Team and Its Role ....................... 4

      B.    Digital Risk and Its Role ....................................................................... 4

      C.    The Quality Control Process .................................................................. 6

            1.    Quality Control of the Analytic Focus Reunderwriters' Data Aggregation 6

            2.    Quality Control of Digital Risk's Data Aggregation ................................. 7

      D.    Holt's Data Review and Breach Conclusions ........................................ 8

II.   THE ANALYTIC FOCUS REUNDERWRITERS' CONCLUSIONS AS TO THE DIGITAL RISK QC GROUP ..................................................................... 9

III.  THE ABSNET MLS ................................................................................... 11

IV.   ABSHIER'S REUNDERWRITING PROCESS ............................................. 12

ARGUMENT ...................................................................................................... 13

I.    HOLT'S TESTIMONY IS ADMISSIBLE BECAUSE HE RELIED ON DIGITAL RISK FOR DATA AGGREGATION, NOT FOR CONCLUSIONS BASED ON THAT DATA ................................................................................................. 13

II.   WMC'S QUIBBLES WITH HOLT'S REUNDERWRITING OF THOUSANDS OF LOANS GO TO WEIGHT, NOT ADMISSIBILITY .................................... 16

CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

Am. Home Assurance Co. v. Merck & Co.,
    462 F.Supp.2d 435 (S.D.N.Y. 2006) ..................................................................... 14

B.F. Goodrich v. Betkoski,
    99 F.3d 505 (2d Cir. 1996) ........................................................................... 14, 16

Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,
    No. 09 CIV 3020 SAS, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .................. 14

Bryan v. John Bean Div. of FMC Corp.,
    566 F.2d 541 (5th Cir. 1978) ............................................................................... 14

Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) .................................................................. 14

Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.,
    350 F. Supp. 2d 582 (D. Del. 2004) ..................................................................... 15

Estate of Cape,
    No. 11-C-0357, 2013 WL 4522933 (E.D. Wisc. Aug. 27, 2013) ......................... 15

Gussack Realty Co. v. Xerox Corp.,
    224 F.3d 85 (2d Cir. 2000) .................................................................................. 13

Jung v. Neschis,
    No. 01 Civ. 6993 RMBTHK, 2007 WL 5256966 (S.D.N.Y. Oct. 23, 2007) ........ 14

Mike's Train House v. Lionel, L.L.C.,
    472 F.3d 398 (6th Cir. 2007) ............................................................................... 15

New York v. Nat'l Serv. Indus., Inc.,
    460 F.3d 201 (2d Cir. 2006) ................................................................................ 14

Quiles v. Bradford-Whit Corp.,
    No. 10-CV-747, 2012 WL 1355262 (N.D.N.Y. Apr. 18, 2012) ........................... 15

TK-7 Corp. v. Estate of Barbouti,
    993 F.3d 722 (10th Cir. 1993) ............................................................................. 15

U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.,
    No. 12 CIV 6811 CM, 2015 WL 3932791 (S.D.N.Y. June 22, 2015) .................. 16

United States v. Grey Bear,
    883 F.2d 1382 (8th Cir. 1989) ................................................................................. 15

United States v. Mejia,
    545 F.3d 179 (2d Cir. 2008) .................................................................................... 15

**Other Authorities**

Fed. R. Evid. 703 .......................................................................................................... 13

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| AF | Analytic Focus |
| Bartlit Beck | Bartlit Beck Herman Palenchar & Scott LLP |
| Defendants | WMC and GE Mortgage |
| DR | Digital Risk |
| DR Narrative | Loan-by-loan schedules including factual summaries of the loan files, and other materials as they relate to each Representation and Warranty breach, created by Digital Risk |
| DR QC Group | The 1,502 loans reunderwritten by Digital Risk |
| Glenview | Glenview Capital Management, LLC |
| Liquidated Mortgage Loan | Mortgage Loan as to which a Final Recovery Determination has been made and the Mortgage Loan is no longer outstanding in the Trust |
| LTV | Loan-to-value ratio |
| MLPAs | Originator MLPA and Seller MLPA |
| MLS | The mortgage loan schedule attached as Exhibit No. 99.1 to GE-WMC Mortgage Securities, L.L.C.'s Form 8-K dated August 23, 2006 |
| Mortgage Loans | The 4,654 loans included in the Trust |
| Origination Loan Files | The collection of documents related to the origination of each of the Mortgage Loans as maintained by WMC Mortgage Corp. |
| Originator MLPA | Mortgage Loan Purchase Agreement dated August 10, 2006 between WMC Mortgage Corp. and GE Mortgage Holding, L.L.C. (JX 1) |
| Representations and Warranties | Representations and warranties made by WMC in Section 6 of the Originator MLPA |
| Seller MLPA | Mortgage Loan Purchase Agreement dated August 10, 2006 between GE Mortgage Holding, L.L.C. and GE-WMC Mortgage Securities, L.L.C. (JX 2) |
| Trust | GE-WMC Mortgage Securities Trust 2006-1 |
| Trustee or Plaintiff | The Bank of New York Mellon, solely as Trustee for GE-WMC Mortgage Securities Trust 2006-1 |
| Underwriter | Citigroup Global Markets, Inc. |
| WMC | WMC Mortgage, LLC |
| Capitalized terms not defined here have the meaning set forth in the Transaction Documents. | |

Plaintiff Bank of New York Mellon, solely as Trustee for GE-WMC Mortgage Securities Trust 2006-1, respectfully submits this memorandum of law in opposition to WMC's Motion to Limit the Expert Testimony of Ira H. Holt.

## **INTRODUCTION**

There are real differences of opinion between the Trustee's reunderwriting expert Ira H. Holt, Jr., and Defendants' expert David E. Abshier.  Those differences include, for example, whether industry standards require documentation of compensating factors in a loan file (yes according to Holt, no according to Abshier) and whether there are industry standards of prudent mortgage origination distinct from an individual lender's underwriting guidelines (yes according to Holt, no according to Abshier).  Some of those differences of opinion should appropriately be tested at trial.  As to others, as the Trustee explains in its own motion *in limine*, Defendants' expert Abshier should be precluded from testifying at all because his opinions are inconsistent with the plain terms of the MLPA, or because he relies on the purported standards of an industry of so-called "non-prime mortgage origination" that he is completely unable to support.[1]

WMC seeks to deflect attention from those real differences of opinion—and their own expert's weaknesses on the issues of substance—with a motion directed at a single non-issue.  At bottom, WMC's motion to limit Holt's testimony turns on the answer to a single question:  Are Holt's opinions about the Defendants' material breaches of Representations and Warranties

---

[1] The Trustee addresses those substantive differences of opinion in Part I of its Response to WMC's Pretrial Memorandum, which responds to Parts II.B-D of WMC's Pretrial Memorandum, at pp. 32-44.

inadmissible because Holt rendered those opinions on many Mortgage Loans using data about the loan files that Digital Risk, a third party vendor, compiled?[2]

The answer is "no" —Holt's testimony as admissible.  It is well-established that while an expert may not simply repeat the opinion of another expert as if it were his or her own, an expert may reach his or her opinions using facts and data compiled by a third party.  Here, Digital Risk supplied Holt with facts and data—which Holt tested to ensure their accuracy.  Holt's opinions are his own.

Holt relied on Digital Risk's translation of roughly 1,500 loan files and other information into condensed factual summaries that captured the relevant characteristics of each loan (such as debt-to-income ratio and loan-to-value ratio).  To be confident that Digital Risk's data compilation was reliable, Holt's team subjected a 256-loan sample of the Digital Risk data set to a double-blind quality control process.  Across the entire 256-loan sample, Holt's team concurred with Digital Risk's factual assessment of each loan, even as Holt's underwriters arrived at different conclusions about 50 of the loans.  Having subjected the Digital Risk factual summaries to a quality control process, Holt then applied his own analysis to them:  Holt reviewed every one of Digital Risk's factual summaries and independently drew conclusions as to whether there were material breaches of Representations and Warranties breaches based on the data Digital Risk had compiled.

The superficiality of WMC's attempt to attack Holt for his use of Digital Risk's data aggregations is evident from the fact that Defendants' own expert Abshier contested fewer of the

---

[2] The Trustee also addresses Holt's use of Digital Risk's data compilations in Part I.B of its Reponse to WMC's Pretrial Memorandum, which responds to Part II.A of WMC's Pretrial Memorandum, at pp. 42-44, and incorporates that response by reference here.

loans for which Digital Risk aggregated data (72%) than the loans for which Holt's own team aggregated data (83%).

In short, Holt's reliance on Digital Risk's data compilations—following his own testing to ensure their accuracy—does not undercut the admissibility of his expert opinions. Defendants may advance its criticisms of Holt's methods, analyses, and conclusions at trial. The Trustee is confident that this Court is well-equipped to evaluate the merit—or lack thereof—of those criticisms. At trial, Holt's work will stand in striking contrast to WMC's deficient underwriting, which resulted in thousands of loans in the Trust with material breaches of Representations and Warranties.

WMC's motion to limit Holt's testimony should be denied.

## BACKGROUND

### I.    HOLT'S REUNDERWRITING PROCESS

Holt works at Analytic Focus, an underwriting and analytics services company, and has 25 years of experience in the mortgage industry. Holt Decl. ¶ 1. Holt has testified as an expert at trial or by deposition in nine previous cases and he was qualified as an expert on residential mortgage loan underwriting in In re Washington Mutual Mortgage Backed Securities Litigation, 2:09-cv-00037-MJP (W.D. Wash. 2009), and in In re Bank of America Hustle Litigation, 1:12-cv-1422-JSR (S.D.N.Y. 2012). Id. ¶ 12. Before Holt's time at Analytic Focus, he had underwritten over 5,000 mortgage loans. Id. ¶ 11. Since joining Analytic Focus, Holt has reunderwritten over 250,000 mortgage loans. Id.

Relying on his wealth of experience in underwriting, Holt performed a reunderwriting analysis in this matter using industry-accepted methods. Holt's reunderwriting process was a forensic review involving a detailed examination and evaluation of the Mortgage Loans to determine whether they complied with WMC's underwriting guidelines and Defendants'

Representations and Warranties.  Id. ¶ 177.  Holt based his conclusions on aggregations of pertinent data in the loan files prepared by reunderwriters at two entities:  Analytic Focus and Digital Risk.  Id. ¶ 179.

### A.    The Analytic Focus Reunderwriting Team and Its Role

The Analytic Focus team consisted of over twenty reunderwriters, who possess over two-hundred combined years of experience in residential mortgage underwriting, consumer loan underwriting, commercial loan underwriting, commercial and residential construction lending, private banking, mortgage auditing, and other lending functions.  Id. ¶ 180.  Each member of Analytic Focus's team has multiple years of underwriting experience.  Id.

Holt instructed the Analytic Focus reunderwriting team to review the Mortgage Loans assigned to them against the applicable guidelines and to record their factual findings.  Id. ¶ 182. He further directed the Analytic Focus reunderwriting team to focus solely on the four-corners of the loan file in reunderwriting the Mortgage Loans and then to review public information and other third-party records in cases where a loan file contained red flags (i.e. discrepancies suggesting underwriting defects).  Id.  Analytic Focus's reunderwriting focused only on six Representations and Warranties:  MLPA §§ 6(a)(1), 6(a)(21), 6(a)(24), 6(a)(31), 6(a)(33),  and 6(a)(44).  Id.  Based on its reunderwriting, the Analytic Focus reunderwriters created a factual summary of each Mortgage Loan they reviewed.  Id.  Thus, the Analytic Focus reunderwriters working under Holt essentially served as data aggregators who took voluminous loan files and translated them into their pertinent data points.  Id.

### B.    Digital Risk and Its Role

Holt's team of reunderwriters at Analytic Focus did not need to perform this data aggregation function for 1,511 of the Mortgage Loans because Digital Risk, acting at the

direction of Glenview and under the supervision of Glenview's counsel, Bartlit Beck Herman Palenchar & Scott LLP, had already reunderwritten them in 2012.  Id. ¶¶ 179, 186.

Digital Risk, founded in 2005, is a leading nationwide forensic review firm.  Id. ¶ 184. Owned and operated by experienced mortgage industry professionals, it provides risk, compliance, and transaction management services within the mortgage industry.  Id.  It has completed over $125 billion in loan reviews.  Id.  Digital Risk has provided reunderwriting services to Fannie Mae, Freddie Mac and leading financial guarantors, including Assured Guaranty.  Id.  By 2012, Digital Risk's reunderwriting services in the litigation context had resulted in the recovery of approximately $100 billion.  Id.

Digital Risk employs a standard industry-accepted reunderwriting process consistent with Analytic Focus's and Abshier's.  This process begins with capturing relevant information from the loan files and applicable guidelines, acquiring relevant third-party information, and reunderwriting the loans by comparison to the guidelines and representations and warranties.  Id. ¶ 185.  Digital Risk employed this same process in 2012, when it reunderwrote the 1,511 Mortgage Loans in this case.  Id. ¶ 186.

The first stage of Digital Risk's reunderwriting process was the preparation of schedules that identified each Representation and Warranty breach that it identified for each mortgage loan it reviewed (the "Digital Risk Schedules").  Id.  These schedules are industry standard.  Id. Included in the Digital Risk Schedules were narratives for each Representation and Warranty breach that identified the facts relevant to each breach (the "Digital Risk Narratives").  Id.  The Digital Risk Narratives captured the same factual information that the Analytic Focus underwriters working under Holt did.  Id.

Certain aspects of Digital Risk's reunderwriting process were different from Analytic Focus's process.  Id. ¶ 187.  Specifically, Digital Risk identified breaches that included the six Representations and Warranties on which the Analytic Focus reunderwriters focused, and then also identified breaches of a number of other representations and warranties.  Id.  In addition, for each loan, Digital Risk acquired all information relevant to each loan file (including third-party documents) and then reunderwrote the loans with the benefit of the third-party information.  Id.  Last, Digital Risk did not conduct an independent search for undocumented compensating factors, while Analytic Focus did.  Id.  Digital Risk's approach is consistent with WMC's guidelines and prudent mortgage origination standards.  Id.  The differences in Analytic Focus's approach reflect Analytic Focus's highly conservative practices, which result only conclusions more favorable to Defendnats.  Id.  Both Digital Risk's and Analytic Focus's approaches are standard and industry-accepted.  Id.

### C.    The Quality Control Process

The Analytic Focus reunderwriters' and Digital Risk reunderwriters' data aggregations contained the factual information Holt needed in order to perform his analysis.  Id. ¶ 188.  For him to rely on this work product, Holt required that both sets of the summaries pass his quality control process.  Id.

#### 1.    Quality Control of the Analytic Focus Reunderwriters' Data Aggregation

There are four steps to the quality control process Analytic Focus applied to the Analytic Focus reunderwriters' work.  Id. ¶ 189.  First, a senior underwriter reviewed a reunderwriter's work to confirm its factual accuracy.  Id.  Second, after a senior underwriter approved the reunderwriter's work, an associate director would then review the reunderwriter's work to again confirm its factual accuracy.  Id.  Third, Analytic Focus conducted a double-blind quality control review in which one reunderwriter would independently reunderwrite a loan previously

reunderwritten by the initial reunderwriter, ensuring that the factual parameters that the reunderwriters identified for that loan were consistent, conformed with one another, and were correctly portrayed.  Id.  Fourth, Holt performed an additional quality control check by both reviewing individual loan files and performing a macro statistical review of the results of the individual reunderwriting.  Id.

Discrepancies were rare, primarily because the data aggregation component of underwriting is a relatively straightforward process.  Id. ¶ 190.  Where discrepancies were identified, Analytic Focus's reunderwriters and directors consulted the loan file to confirm the narratives' factual accuracy.  Id.  Once each loan's factual summary had passed this quality control process, Holt felt comfortable relying on them.  Id.

2.      Quality Control of Digital Risk's Data Aggregation

To ensure the accuracy of the Digital Risk Narratives, Holt subjected them to a quality-control process similar to the one he used for the Analytic Focus reunderwriters' work.  Id. ¶ 191.  First, Analytic Focus selected 256 of the loans that Digital Risk reunderwrote (the "Digital Risk QC Group") and obtained the relevant information for each of those loans (e.g. each loan's loan file, any relevant third party documents, etc.).  Id. ¶ 192.  Second, each of the loans in the Digital Risk QC Group was assigned to Analytic Focus reunderwriters.  Id. ¶ 193.  Those reunderwriters then reunderwrote those loans using Analytic Focus's standard practices and methodologies.  Id.  The Analytic Focus reunderwriters performed this reunderwriting on a blind basis; that is, they were unaware of Digital Risk's factual assessment of each loan while they were reunderwriting the Digital Risk QC Group.  Id.  In connection with this analysis, the Analytic Focus reunderwriters generated their own factual summaries about each loan.  Id.  Third, a senior reunderwriter reviewed those results to confirm their factual accuracy, followed by an assistant director at Analytic Focus doing the same.  Id. ¶ 194.  Fourth, Holt personally

compared Analytic Focus's factual findings for each loan in the Digital Risk QC Group to

Digital Risk's factual findings for those loans.  Id. ¶ 195.  The Analytic Focus reunderwriters'

factual summaries of the Digital Risk QC Group (which had passed Analytic Focus's quality

control process) were consistent with Digital Risk's factual summaries.  Id.

The Analytic Focus reunderwriting team's factual assessment of the Digital Risk QC

Group confirmed the accuracy of Digital Risk's factual assessment of the same loans.  Id. ¶ 196.

Holt was, accordingly, confident that the Digital Risk Narratives for the loans outside of the

Digital Risk QC Group also were accurate and that Digital Risk had employed industry standard

practices in generating the Digital Risk Narratives.[3]  Id.

### D.    Holt's Data Review and Breach Conclusions

Having aggregated factual summaries for all of the Mortgage Loans—all of which had

passed Analytic Focus's quality control test—Holt conducted an independent review of those

facts to draw conclusions as to Representation and Warranty breaches.  Id. ¶ 201.  More

specifically, he reviewed the factual summaries for each Mortgage Loan and identified whether

those facts resulted in those loans being in material breach of the Representations and

Warranties.  Id.

His analysis focused on breaches of MLPA §§ 6(a)(1), 6(a)(21), 6(a)(24), 6(a)(31),

6(a)(33),  and 6(a)(44)  because those six Representations and Warranties are particularly

---

[3] Holt recently visited Digital Risk in connection with another matter.  That meeting
further confirmed his understanding that Digital Risk applies industry standard methodology and
procedures, including with respect to their work on this Trust.  Holt Decl. ¶ 196 & n.19.

8

germane to a loan's risk profile.  Id. ¶ 202.  If Holt found that a loan did not breach one of those six Representations and Warranties, he did not categorize it as a materially breaching loan.  Id.[4]

In reaching those conclusions as to Representation and Warranty breaches, Holt did not rely on conclusions about the presence or absence of breaches reached either by Digital Risk's reunderwriters or the reunderwriters on his team at Analytic Focus.  Rather, he relied on each group of reunderwriters' factual summaries of the loans.[5]  Id. ¶ 203.  After reviewing all of the factual summaries, and identifying the breach conclusions with which he agreed and disagreed, Holt compiled breach reports that identified the Representation and Warranty breaches and their accompanying factual underpinnings.  Id. ¶ 204.

## II.   THE ANALYTIC FOCUS REUNDERWRITERS' CONCLUSIONS AS TO THE DIGITAL RISK QC GROUP

WMC wrongly claims that the Analytic Focus reunderwriters' analysis of the Digital Risk QC Group "contradicted Digital Risk's breach assessments for more than 50" of the loans in that group.  In fact, the Analytic Focus reunderwriters categorized each loan as either an "IQ-1," "IQ-2," or "IQ-3."  IQ-3 loans are loans that were originated with material breaches of WMC's guidelines.  Id. ¶ 197.  IQ-2 loans are loans that were originated with deviations from WMC's guidelines, but that had compensating factors that the reunderwriters believed

---

[4] WMC's concern with breaches of Section 5 of the Originator MLPA is misplaced.  As shown in Exhibit E to Holt's Direct Trial Testimony, the Trustee alleges breaches of the six Representations and Warranties on which Holt focused.  Holt Decl. ¶ 240 & Ex. E.  WMC also claims that Holt identified loans to be materially defective with only "a Patriot Act allegation."  That is untrue.  Every loan that Holt identifies as materially breaching is in breach of one of the six representations and warranties on which Holt focused.  Id. Ex. E.  This includes those that WMC lists at footnote 2 of its brief, all of which identify a breach of MLPA 6(a)(21).

[5] For this reason, WMC's refrain that Holt "adopted DR's breach analyses and conclusions for every single loan" and that he has not "render[ed] any sort of expert analysis of his loan" is false.  As Holt testified, he did not rely on a single conclusion that DR rendered, he only relied on their factual summations.  Holt Decl. ¶¶ 201-204.

adequately offset the guidelines deviations.  Id.  IQ-1 loans were loans that the reunderwriters

believed were originated consistent with WMC's guidelines.  Id.

WMC asserts that Analytic Focus's assignment of either IQ-1 or IQ-2 ratings to loans in

the Digital Risk QC Group means that Analytic Focus disagreed with Digital Risk's conclusions

that those loans are materially breaching.  The Analytic Focus reunderwriters, however, were

conducting a different analysis than Digital Risk, which could lead to differing conclusions.  Id. ¶

199.  For example, the Analytic Focus reunderwriters—in performing their quality control test of

the Digital Risk QC Group—focused on compliance with WMC's guidelines only, whereas

Digital Risk analyzed breaches of multiple Representations and Warranties with more third-party

data at hand.[6]  Id.  Thus, where Digital Risk identified a breach under MLPA § 6(a)(21) (prudent

origination standards) and not MLPA § 6(a)(24) (guidelines compliance), Analytic Focus likely

would not have identified a breach because it was looking only for guidelines breaches.  Id.  In

addition, the Analytic Focus underwriters took the conservative step of accounting for

undocumented compensating factors in their analysis while Digital Risk considered only

documented compensating factors.  Id.  In light of these differing analyses, Holt personally

identified and understood why the two groups of underwriters reached different loan-level

conclusions in some instances, given the different analyses.  Id. ¶ 200.  Accordingly, WMC's

claim that Analytic Focus disagreed with Digital Risk's breach conclusions is wrong.  Id.

Moreover, Abshier does not contest more than 25% of the loans in the DR QC Group that the

Analytic Focus reunderwriters categorized as either an IQ-1 or an IQ-2—i.e., the instances in

---

[6] Analytic Focus's quality control process for the Digital Risk QC Group focused on guidelines compliance because that analysis was sufficient to confirm that the Digital Risk Narratives were accurate and reliable.  Id. ¶ 199 & n.20.

which WMC claims that Analytic Focus purportedly disagreed with Digital Risk's breach findings.  <u>Id</u>. ¶¶ 268; <u>see</u> <u>id</u>. ¶¶ 197-200.

## III.    THE ABSNET MLS

In April 2015, it was brought to Holt's attention that the mortgage loan schedule that Digital Risk had been directed to use in identifying breaches of the MLS Representation for its 2012 reunderwriting project (the "ABSNet MLS") contained inaccurate data.  <u>Id</u>. ¶ 205.  That resulted in the Digital Risk Narratives accurately conveying inaccurate information which caused Holt to identify breaches that, when accounting for the correct data, were not in fact breaches. <u>Id</u>.  Accordingly, Holt adjusted his findings to account for the correct MLS data and those edits to his findings were reflected in a Second Amended Appendix 2 to his expert report, provided to Defendants on June 9, 2015.  <u>Id</u>. ¶ 207.

Holt was surprised to learn that ABSNet's data for this trust was inaccurate.  <u>Id</u>. ¶ 206. ABSNet is a Moody's Analytics product that is commonly relied on in the financial industry as a source of accurate data.  <u>Id</u>.  It provides performance data coverage for over 200,000 bonds and thousands of market participants in over ten countries rely on its data's accuracy, including industry leaders such as Bank of America, Credit Suisse, Deutsche Bank, Standard & Poor's, UBS AG, Charles Schwab Investment Management, Fidelity Investments, and the Federal Reserve Bank of New York.  <u>Id</u>.  Even more surprising is that—despite ABSNet's well-regarded data systems—ABSNet's MLS for this Trust remained inaccurate as recently as May 2015.  <u>Id</u>.

Holt's quality control process for the loans that Digital Risk reunderwrote did not uncover that the ABSNet MLS contained inaccurate data because that process was designed to test whether Digital Risk's factual summaries accurately captured the facts that Digital Risk had in its possession.  <u>Id</u>. ¶ 208.   It was designed to test only that because that is what Holt relied on Digital Risk for—their factual summaries of the loan files and related documents—and not their

11

conclusions as to Representation and Warranty breaches.  Id.  For this reason, in reunderwriting

the Digital Risk QC Group, Analytic Focus used the ABSNet MLS (because that is what Digital

Risk had used) and found that Digital Risk's factual summaries accurately captured the data in

the ABSNet MLS.  Id. ¶ 209.

Accordingly, Holt's confidence in relying on Digital Risk's factual summaries for each

loan was unaffected by the fact that many of Digital Risk's conclusions as to the MLS

Representation were wrong owing to the inaccurate ABSNet MLS data.  Id. ¶ 210.  That is

because Digital Risk correctly did what Holt relied on it for —it accurately summarized the facts

in its possession—and Digital Risk's erroneous breach conclusions did not concern Holt because

he drew his own conclusions as to breaches of the Representations and Warranties.  Id.

## IV.    ABSHIER'S REUNDERWRITING PROCESS

By comparison, Abshier's reunderwriting process was comparable in some ways to

Holt's and in other ways less reliable.

First, Abshier assembled his team using independent contractors and a temp agency.

Abshier Dep. 235:1- 22.  Thus, rather than relying on two entities that are industry known and, in

Digital Risk's case, relied upon by entities such as Fannie Mae and Freddie Mac, Abshier

utilized unaffiliated or under-employed individuals with virtually no discernible market

reputation.  Second, consistent with reunderwriting's straightforward nature, Abshier did not

provide his team with a discernible reunderwriting methodology.  Id. 241:13-243:3; 246:4-

249:20.  He did not provide his reunderwriters any written instructions and the extent of his

training was to provide his underwriters with the loan files, walk them through the guidelines,

provide them office space, and tell them to reunderwrite the loans.  Id.  Indeed, at deposition

Abshier failed to convey any specific reunderwriting methodology and training beyond

instructing his reunderwriters to employ their experience in entering the loans' relevant data

points into an Excel spreadsheet.  Id.  Third, like Holt, Abshier subjected the work product his reunderwriters provided to his quality control tests.  Once the work product passed those tests he relied on it.  Id. 257:1-258:4.  Fourth, like Holt, Abshier then relied on his reunderwriters' work product to independently draw breach conclusions.  Id.

Abshier's own process revealed that Digital Risk's methodology was sound.  Indeed, he found that Holt's opinions relying on Digital Risk's work product (with which WMC takes issue) were more accurate than Holt's opinions relying on Analytic Focus's work product (which WMC does not challenge in their Motion).    Specifically, Abshier did not contest 29.0% of the loans that Digital Risk reunderwrote and, by comparison, did not contest 17.9% of the loans that Analytic Focus underwrote.  Holt Decl. ¶ 268.

## ARGUMENT

### I.    HOLT'S TESTIMONY IS ADMISSIBLE BECAUSE HE RELIED ON DIGITAL RISK FOR DATA AGGREGATION, NOT FOR CONCLUSIONS BASED ON THAT DATA

It is well-established that a testifying expert may rely on data collected by third parties in forming his or her opinions.  Indeed, Federal Rule of Evidence 703 expressly provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  (Emphasis added.)

In Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94 (2d Cir. 2000), for example, the plaintiffs' expert opined on the cause of pollution to the plaintiff's land, relying on information collected by the defendant's expert and the NY Department of Environmental Conservation. Affirming the District Court's denial of a motion to exclude the experts' testimony, the Second Circuit rejected the argument that the expert's testimony was somehow inadmissible because "plaintiffs' experts failed to conduct their own tests and relied only on data provided by Xerox's own experts and the DEC."  Id. at 94; accord B.F. Goodrich v. Betkoski, 99 F.3d 505, 524 (2d

Cir. 1996), <u>overruled on other grounds as recognized in</u> <u>New York v. Nat'l Serv. Indus., Inc.</u>, 460 F.3d 201, 205 (2d Cir. 2006) ("Dr. Brown did not personally visit the landfills or dig up any shovelfuls of waste, but he was not required to do so.").

The crucial distinction is "between the rather prejudicial circumstance of experts relying upon, or reciting, the <u>opinions</u> of other experts not subject to cross-examination, and modern evidence law's apparent recognition that experts often rely on <u>facts and data</u> supplied by third-parties, including other experts." <u>Jung v. Neschis</u>, No. 01 Civ. 6993 RMBTHK, 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007), <u>report and recommendation adopted</u> (Sept. 21, 2007) (citing <u>Bryan v. John Bean Div. of FMC Corp.</u>, 566 F.2d 541, 545 (5th Cir. 1978), and <u>Am. Home Assurance Co. v. Merck & Co.</u>, 462 F.Supp.2d 435, 448 (S.D.N.Y. 2006)) (emphasis in original).

In short: "There is nothing improper about an expert relying on third-parties for data collection." <u>Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.</u>, No. 09 CIV 3020 SAS, 2011 WL 6288415, at *10 (S.D.N.Y. Dec. 15, 2011); <u>accord</u> <u>Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.</u>, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) (explaining that "[e]xperts need not have actually collected the data on which they base their conclusions in order to be credible" and admitting expert testimony where "the experts have based their conclusions on reliable results from tests conducted by independent consultants").

Holt's opinion is admissible because he relied on <u>facts and data</u> collected by Digital Risk while applying his own analysis to reach his own <u>opinions</u>. While Digital Risk provided aggregated data, Holt's opinions about whether that data compiled for each loan file supported breaches of Representations and Warranties are Holt's opinions and Holt's alone. Holt Decl. ¶¶ 201-204. There is no difference between Holt's method and Abshier's in this respect: Both

14

relied on aggregated data prepared by others and used that aggregated data to reach their own conclusions about breaches of Representations and Warranties.  Abshier Dep. 257:14-258:8.

Accordingly, the cases WMC cites in which courts excluded the testimony of proffered experts who simply repeated conclusions reached by other experts or transmitted hearsay to the factfinder are not on point.   See United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008); Mike's Train House v. Lionel, L.L.C., 472 F.3d 398, 409 (6th Cir. 2007); TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993); United States v. Grey Bear, 883 F.2d 1382, 1392-93 (8th Cir. 1989); Estate of Cape, No. 11-C-0357, 2013 WL 4522933, at *3 (E.D. Wisc. Aug. 27, 2013); Quiles v. Bradford-Whit Corp., No. 10-CV-747, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012); Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc., 350 F. Supp. 2d 582, 592 (D. Del. 2004).

WMC's attack on Holt, moreover, is superficial and does not touch the reliability of Holt's expert opinions, as is evident from the fact that Defendants' own expert Abshier contested fewer of the loans Digital Risk underwrote than the loans Analytic Focus underwrote. Specifically, Abshier did not contest 29.0% of the loans that Digital Risk reunderwrote and, by comparison, did not contest 17.9% of the loans that Analytic Focus underwrote.  Holt Decl. ¶ 268.

WMC suggests that if the Court denied its motion, then "every litigant with sufficient resources would shield the methodologies, processes, and credentials of those actually doing their work."  Mot. at 2.  To the contrary, if the Court grants WMC's motion, then experts will risk exclusion of their testimony if they rely on third-party vendors to collect and process data and evidence.  Contrary to the Second Circuit's instructions, experts will not only have to

perform their own data entry, they will have to "personally visit the landfills" and dig up the "shovelfuls of waste." B.F. Goodrich, 99 F.3d at 524.

## II.   WMC'S QUIBBLES WITH HOLT'S REUNDERWRITING OF THOUSANDS OF LOANS GO TO WEIGHT, NOT ADMISSIBILITY

Much of WMC's brief reads like a closing statement highlighting points emphasized on cross-examination. Although Defendants are certainly free to explore those points at trial, at best those "purported analytical shortcomings go to weight, not admissibility." See, e.g., U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co., No. 12 CIV. 6811 CM, 2015 WL 3932791, at *4 (S.D.N.Y. June 22, 2015) ("U.S. Bank points to a laundry-list of things Pfeifer failed to do: oversee French's work, consult with French, ensure French properly applied his methodology to his data, and obtain and verify French's data. These are proper subjects for cross-examination and sound like excellent bases on which U.S. Bank could impeach Pfeifer. None of these alleged defects, however, shows that Pfeifer failed to understand French's work or incorporate it properly in formulating his own conclusions. Pfeifer's purported analytical shortcomings go to weight, not admissibility.").

In any event, WMC's attacks miss the mark. For example, WMC focuses on a particular breach narrative for loan 11521149/#20647640 that was included in Holt's initial expert report dated December 23, 2015 and which included a narrative that did not make sense. However, (i) this was the only breach containing a nonsensical narrative in Holt's report dated December 23, 2014; (ii) this particular breach narrative was one of over 5,000 breaches included in that report, less than .02% of that report's breach allegations; and (iii) Holt removed that breach from his report when on June 9, 2015, the Trustee provided Defendants with the Second Amended Appendix 2 to his amended report dated February 23, 2015. Holt Decl. ¶ 204 & n.21. WMC's strategy of highlighting isolated and immaterial errors in Holt's Rule 26 disclosures should not

16

distract the Court from the pervasive and material breaches of Representations and Warranties in the Mortgage Loans WMC selected for the Trust, over 25% of which Defendants do not even contest.[7]

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully submits that the Court should deny WMC's motion.


Dated: August 13, 2015

                                                    Respectfully Submitted,

                                                    BOIES, SCHILLER & FLEXNER LLP


                                                    _____/s/ Motty Shulman_____
                                                    William S. Ohlemeyer (wohlemeyer@bsfllp.com)
                                                    Robin A. Henry (rhenry@bsfllp.com)
                                                    Motty Shulman (mshulman@bsfllp.com)
                                                    Ian M. Dumain (idumain@bsfllp.com)
                                                    Nathan A. Holcomb (nholcomb@bsfllp.com)
                                                    333 Main Street
                                                    Armonk, NY 10504
                                                    P:  914-749-8200
                                                    F:  914-749-8300

                                                    *Attorneys for Plaintiff The Bank of New York
                                                    Mellon, solely as Trustee for GE-WMC Mortgage
                                                    Securities Trust 2006-1*

---

[7] WMC also directs an argument at Holt's statement in his January 21, 2015, Declaration. Mot. at 22-24.  That declaration was submitted in opposition to Defendants' motion for partial summary judgment regarding the issue of liquidated loans.  In light of the Court's decision on that issue, the Trustee does not intend to offer that opinion in Holt's trial testimony.